1               IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
2                       DALLAS DIVISION

3  UNITED STATES OF AMERICA,      )   **Case No. 3:17-CR-00499-M-1**
                                  )
4           Plaintiff,            )
                                  )   Dallas, Texas
5  v.                             )   October 16, 2017
                                  )   2:00 p.m.
6  ERIC GERARD MCGINNIS,          )
                                  )   DETENTION HEARING
7           Defendant.            )
   _____)

8
                    TRANSCRIPT OF PROCEEDINGS
9        BEFORE THE HONORABLE RENEE HARRIS TOLIVER,
              UNITED STATES MAGISTRATE JUDGE.
10
   APPEARANCES:
11
   For the Government:        Brian McKay
12                            UNITED STATES ATTORNEY'S OFFICE
                              1100 Commerce Street, Third Floor
13                            Dallas, TX  75242-1699
                              (214) 659-8600
14
   For the Defendant:         Doug Morris
15                            FEDERAL PUBLIC DEFENDER'S OFFICE
                              525 Griffin Street, Suite 629
16                            Dallas, TX  75202
                              (214) 767-2746
17
   Court Recorder:            Jane W. Amerson
18                            UNITED STATES DISTRICT COURT
                              1100 Commerce Street, Room 1611
19                            Dallas, TX  75242-1003
                              (214) 753-2360
20
   Transcription Service:     Kathy Rehling
21                            311 Paradise Cove
                              Shady Shores, TX  76208
22                            (972) 786-3063

23

24
          Proceedings recorded by electronic sound recording;
25            transcript produced by transcription service.

1          <u>DALLAS, TEXAS - OCTOBER 16, 2017 - 2:10 P.M.</u>

2          THE COURT:  Good afternoon.  Please be seated.  The

3   Court first calls for a hearing Case No. 3:17-CR-499-M, United

4   States of America versus Eric Gerard McGinnis.

5          MR. MCKAY:  Brian McKay for the United States.

6          MR. MORRIS:  And Doug Morris for Mr. McGinnis, Your

7   Honor.

8          THE COURT:  Are you ready to proceed?

9          MR. MCKAY:  Yes, Your Honor.

10          THE COURT:  Mr. Morris, are you ready?

11          MR. MORRIS:  Yes, Your Honor.

12          THE COURT:  Okay.  You may call your first witness.

13          MR. MCKAY:  The Government calls Scott Satcher.

14      (The witness is sworn.)

15          THE CLERK:  Have a seat, please.  Will you state your

16   name and spell it for the record, please?

17          THE WITNESS:  Scott Satcher, S-A-T-C-H-E-R.

18          THE COURT:  You may proceed.

19          SCOTT SATCHER, GOVERNMENT'S WITNESS, SWORN

20                    DIRECT EXAMINATION

21   BY MR. MCKAY:

22   Q   Mr. Satcher, how are you employed?

23   A   Special agent, Bureau of Alcohol, Tobacco, Firearms &

24   Explosives.

25   Q   And how long have you been an agent?

1   A    Fourteen years.

2   Q    During your -- discharging your duties as an agent, have

3   you come to investigate the case against Eric Gerard McGinnis?

4   A    Yes, sir.

5   Q    Can you describe the events of July 28th that have led to

6   his charging in this indictment?

7   A    Yes, sir.  On July 28, 2017, officers from the Grand

8   Prairie Police Department were dispatched to the 1200 block of

9   North Beltline, a wooded area within Grand Prairie.  Once on-

10  scene, they overheard firearm discharge or shots being fired.

11  They had prepared to -- they had seen a vehicle that was parked

12  in a trailhead into the wooded area.  As they were preparing to

13  make entry into that area, Mr. McGinnis was walking towards

14  them.  They asked him to stop.  He was carrying a green

15  backpack.  They asked him to place the -- or they ordered him

16  to place the backpack on the ground, to raise his shirt to view

17  his waistband to see if he had any other firearms.  He stated

18  there was a firearm in the bag and that he had no other

19  firearms on him.

20  Q    And have you reviewed the Grand Prairie Police Department

21  reports and body cam that reflects all of this?

22  A    Yes, sir.

23  Q    And he identified a firearm that he had in the backpack; is

24  that correct?

25  A    Yes, sir.

1  Q   Can you -- did the officers recover a firearm from that

2  backpack?

3  A   Yes, sir, they did.

4  Q   Can you describe that firearm?

5  A   The firearm itself was a manufactured lower done by a 3D

6  printer.  It bore no markings.  And it had a metal upper on it

7  or a barrel assembly with a barrel that had ten inches in

8  length.

9  Q   And a barrel that's ten inches in length on a rifle like

10 that, does that comply with federal law?

11 A   No, sir.

12 Q   The lower that you described -- what type of firearm was

13 this?

14 A   It was an AR-style rifle.

15 Q   Okay.  The lower that you said was 3D-printed, what was

16 that made of?

17 A   Some sort of resin or plastic.

18 Q   And did it bear a serial number on it?

19 A   No, sir, it did not.

20 Q   At the time officers recovered it, was the gun loaded?

21 A   Yes, sir, it was.

22 Q   Did officers find anything else in that backpack?

23 A   They also located five additional loaded magazines as well

24 as three envelopes of documentation.

25 Q   Okay.  What was on that documentation?

1  A   It was titled "9/11 Terrorists," I believe.

2  Q   We'll come back to that in a minute.  Was he charged that

3  day with discharging a firearm within city limits?

4  A   Yes, sir, he was.

5  Q   During your investigation of Mr. McGinnis, have you learned

6  whether he was, at that time of July 28th, whether he was

7  subject to a protective order?

8  A   Yes, sir, he was.

9  Q   When was that protective order entered?

10  A   The protective order was entered in August of 2015 and

11  expired in August of 2017.

12  Q   And from your review of the protective order, can you tell

13  whether Mr. McGinnis was present when the Dallas County judge

14  entered the protective order against him?

15  A   Yes, sir.

16  Q   And was he present?

17  A   It appeared so, yes, sir.

18  Q   Does the protective order contain any finding about whether

19  family violence had been committed?

20  A   It established it through the wording of the protective

21  order.

22  Q   And did the judge make any finding with respect to whether

23  family violence was likely to occur again?

24  A   Yes, sir.

25  Q   And was that finding an affirmative finding?

Satcher - Direct                                      6

1    A    Yes, sir, it was.

2    Q    Did the protective order prohibit Mr. McGinnis from

3    possessing any firearm?

4    A    Yes, sir, it did.

5    Q    Additionally, in your investigation of Mr. McGinnis, did

6    you learn whether he attempted to purchase a firearm in June of

7    2016?

8    A    Yes, sir, he did.

9    Q    And what did you discover through your investigation?

10   A    That he had attempted to purchase a rifle lower through a

11   federal firearms licensee in Mansfield, Texas.

12   Q    Describe this -- when you say a firearm lower, describe

13   what that would be.

14   A    Basically, a lower is the frame or receiver of a firearm.

15   Q    Was this receiver that he was attempting to buy, would it

16   have fit an AR-style rifle?

17   A    Yes, sir.

18   Q    And was that purchase completed?

19   A    No, sir, it was not.

20   Q    Why not?

21   A    Through the NICS background check, it was determined that

22   the protective order was still in existence and active and that

23   in and of itself was a prohibitor.

24   Q    So he was -- that sale was declined?

25   A    Yes, sir, it was.

1   Q    After that declination, did ATF make contact with Mr.

2   McGinnis?

3   A    According to a report that I was able to recover, yes, sir,

4   they did.

5   Q    And from the report that you reviewed, what did ATF -- what

6   contact did ATF have with --

7   A    ATF contacted Mr. McGinnis via phone.  Apparently, an

8   interview was done.  He was advised of being a prohibited

9   person.  He was also served with a letter via registered mail

10  or a warning letter from ATF describing him being a prohibited

11  person.

12  Q    And in that letter, did it tell him that he could not

13  legally possess a firearm or ammunition?

14  A    Yes, sir.

15  Q    Going back to the firearm that was recovered from Mr.

16  McGinnis's possession on July 28th, has your investigation

17  shown who manufactured or who printed that lower?

18  A    According to jail calls that were obtained from Grand

19  Prairie Police Department, Mr. McGinnis manufactured the lower

20  himself.

21  Q    And did he state in any of those calls how long he had had

22  that rifle?

23  A    That he had had the rifle for approximately one year.

24  Q    Would that be -- would that time frame be consistent with

25  him manufacturing that lower after his attempt to purchase the

1   receiver was declined?

2   A    Yes, sir.

3   Q    Earlier, you mentioned a list of documents -- or, documents

4   that were recovered from Mr. McGinnis's backpack at the time of

5   his arrest in July of this year.

6   A    Yes, sir.

7   Q    Have you had a chance to review those documents?

8   A    Yes, sir.

9   Q    What are your observations about those documents and the

10  contents of them?

11  A    They are names of current and former public officials.

12  There are also numerous addresses per each entry.

13  Q    What have you observed about those addresses?

14  A    That some of the addresses may be their professional

15  address, either in a represented area here in Texas, the Texas

16  ones that I concentrated on, or an office location in

17  Washington D.C., as well as possible residential addresses that

18  are associated to different names.

19  Q    Okay.  You said these may be addresses that tied to elected

20  officials' business addresses.  Have you confirmed any of them

21  actually are the addresses of the named public officials?

22  A    On the business addresses, especially the Washington D.C.

23  ones, yes, those were easily accessible.

24  Q    Okay.  And with respect to what appear to be residential

25  addresses, have you at least confirmed or has someone at ATF at

Satcher - Direct                          9

1  least confirmed that they do tie to a residential address?

2  A    Yes, sir.

3  Q    Having reviewed the body cam footage from Grand Prairie

4  Police Department, have you made any observations about Mr.

5  McGinnis's claiming an association with the United States

6  Government at the time of his detention or arrest?

7  A    Yes.

8  Q    And what observations did you make?

9  A    He identified himself as associated with Central

10 Intelligence.

11 Q    Okay.  Can you tell me the circumstances in which he

12 identified himself that way?

13 A    When he was initially encountered by the officers on-scene,

14 as he was walking towards them he repeated on different

15 occasions that he was with Central Intelligence and that they

16 needed to contact the chief.

17 Q    At the time he was identifying himself as Central

18 Intelligence, was he complying with -- first of all, did

19 officers have him in custody at that time?

20 A    No, sir.  They were trying to get him back towards them to

21 a safe area in order to take him into custody or, at the very

22 least, detain him and place handcuffs on him.

23 Q    And was he complying with officers' directions at the time

24 he was identifying himself as Central Intelligence?

25 A    No, sir.  They were asking him to walk backwards towards

1    their position.  He turned around facing forward and kept

2    walking directly towards the officers.

3    Q    Did officers repeat their instructions?

4    A    Yes, sir.

5    Q    Multiple times?

6    A    Yes, sir.

7    Q    Have you had a chance to review Mr. McGinnis's social media

8    platforms?

9    A    Yes, sir.

10   Q    What observations have you made about his social medial?

11   A    That he identifies himself as a representative of the

12   Central Intelligence Agency or has an association.

13   Q    Have you -- in those accounts that you have seen, account

14   or accounts that you've looked at, have you seen pictures of

15   him?

16   A    Yes, sir.

17   Q    And have you verified this is Eric Gerard McGinnis who's

18   present in court today?

19   A    Yes, sir.

20   Q    Have you witnessed anything else during your investigation

21   suggesting Mr. McGinnis identifies himself as associated with

22   the Central Intelligence Agency?

23   A    Yes, sir.

24   Q    And what was that?

25   A    When he surrendered to ATF at the Federal Building, he

1    turned over what I observed to be a Central Intelligence

2    challenge coin to his father.

3    Q    Okay.  Have you taken any steps to determine whether Mr.

4    McGinnis is associated with the Central Intelligence Agency?

5    A    Yes, sir.

6    Q    And what have you learned through your investigation?

7    A    There is no known association with Mr. McGinnis and the

8    Central Intelligence Agency.

9    Q    During your investigation or this prosecution, has anyone

10   from the Central Intelligence Agency or any other government

11   agency reached out to advise you that Mr. McGinnis, through his

12   possession of the firearm or through any -- at any time, was

13   acting on behalf of or in association with any agency of the

14   United States?

15   A    No, sir.

16   Q    I'll pass the witness.

17                         CROSS-EXAMINATION

18   BY MR. MORRIS:

19   Q    Good afternoon, Agent Satcher.

20   A    Good afternoon.

21   Q    The social media, when you're looking at the social media

22   for CIA connections, did you notice anything that was any kind

23   of tie to any other type of organization at all?

24   A    No.

25   Q    So there wasn't some of these things that were -- I know in

1  law enforcement you're concerned with people or connections to

2  extremist groups or things of that sort; is that right?

3  A    That is correct.

4  Q    And you didn't see any of that, did you?

5  A    No, sir.

6  Q    Now, when Mr. McGinnis was walking toward law enforcement,

7  it sounds like he just -- he wasn't walking backwards, which is

8  a preferred safety method; is that correct?

9  A    That is correct.

10 Q    He was walking forward, but it wasn't meant as --

11 A    He walked backwards for a brief time and as he got closer

12 to the officers he turned around and began walking directly

13 towards them.

14 Q    And that's something that concerns them, but he wasn't

15 brandishing a weapon towards them or anything of that sort?

16 A    No, sir.

17 Q    It just, it's safer in their view, and many other people's

18 view, to walk backwards as opposed to forward; is that right?

19 A    It's safer for everyone.  Yes, sir.

20 Q    But he wasn't aiming guns?  He wasn't going to kill you?

21 "I'm the CIA.  I'm the ..." nothing threatening in that

22 fashion?

23 A    No, sir.

24 Q    Okay.  Now, I'm not from Grand Prairie but I know I've been

25 around Grand Prairie and it's kind of a wooded area; is that

1  correct?

2  A    There are parts of -- yes, sir.  There are wooded areas in

3  the city.

4  Q    So it doesn't -- he wasn't shooting at houses or anything

5  of that sort?  He was just out shooting in the woods kind of

6  thing?  Does that sound right?

7  A    That is my understanding.  Yes, sir.

8  Q    But it is illegal because it is a city; is that right?

9  A    Yes, sir.

10  Q    So he has a -- is that -- I understand it has some type of

11  misdemeanor offense if you're discharging a firearm in the city

12  limits; is that right?

13  A    Yes, sir.  It's a Class A misdemeanor.

14  Q    And the problem here is that this is a sawed-off rifle; is

15  that right?

16  A    Yes, sir.

17  Q    And is this -- you were saying it didn't have a serial

18  number.  I know you've been doing this for a long time.  Do

19  some firearms have serial numbers and some don't and some have

20  them but get rubbed off; is that right?

21  A    Yes, sir.

22  Q    What's the status with this one here?

23  A    This one appears to be -- it was manufactured with no

24  serial number.

25  Q    Okay.  So it's not a matter of this has been obliterated to

1   be hiding or something?  It just didn't have one, --

2   A   Correct.

3   Q   -- the way this thing was put together?

4   A   Yes, sir.

5   Q   Okay.  And this restraining order, domestic violence thing,

6   this is rooted back in -- did you say August 31th of 2015?  Is

7   that right?

8   A   Yes, sir.  That's when it was activated.

9   Q   And in order to have such a thing, the judge has to make a

10  series of findings, and you went over those findings about

11  there -- a potential threat of future violence; is that

12  correct?

13  A   The way it was filed.  Yes, sir.

14  Q   Okay.  Now, in your investigation, was there anything that

15  showed there was any -- ultimately -- doesn't -- I'm not

16  questioning the validity of the document itself, but was there

17  any indication of other arrests or anything of that sort after

18  that would show that there was -- there was -- sometimes people

19  learn their lesson in domestic violence, sometimes they don't.

20  In this situation, was there no further incidents of domestic

21  violence?

22  A   Not to my knowledge.  No, sir.

23  Q   Okay.  So it's, here's your warning, stay away from whoever

24  this is, don't come back?  It sounded like he learned his

25  lesson there?

1   A    Apparently.  There were no other -- there were no further

2   incidents that I could locate.

3   Q    I understand.  And it looks like he was just about 32, 33

4   days from then he could have had some type of firearm, but not

5   a sawed-off rifle, of course; is that right?

6   A    Correct.

7   Q    Okay.  And that's kind of where we are.  The rest -- a lot

8   of this is about kind of extra stuff with CIA and those kind of

9   things.  A person doesn't get in trouble for thinking they're

10  in the CIA, do they?

11  A    No, sir.

12  Q    And as long as they're not making some type of movements

13  that are terrorizing or threatening to people, that's -- just

14  having a bundle of papers in your knapsack is not illegal, is

15  it?

16  A    Correct.

17  Q    And it doesn't -- in his social media or anything, it

18  doesn't sound like he was taking some type of covert or overt

19  actions toward any of these individuals, does it?

20  A    It does not appear, no, sir.

21  Q    Okay.  Now I know that, again, you've been in law

22  enforcement for a long time and I know you've been involved

23  with folks who really are doing those kind of things; is that

24  right?

25  A    Yes, sir.

1   Q   And he's not that guy, is he?  From what you can tell?

2   A   From what I can tell.

3   Q   Okay.  So ultimately what we have is a fellow who sounds

4   like he is a member of the CIA when he's not and he has a

5   sawed-off rifle and he's not supposed to?  But outside of that,

6   he's not a felon or any of things; is that right?

7   A   No.

8   Q   Okay.  And ultimately the Grand Prairie Police were able to

9   arrest him and took him in and bonded him out; is that right?

10  A   Yes, sir.

11  Q   Okay.  That's all I have.  Thank you very much.

12          MR. MCKAY:  Nothing further, Your Honor.

13          THE COURT:  You may step down.  Thank you.

14          THE WITNESS:  Thank you.

15      (The witness steps down.)

16          MR. MCKAY:  The Government rests.

17          MR. MORRIS:  Your Honor, I would like to call Mr.

18  McGinnis's father.  Sir, she's going to swear you in.

19      (The witness is sworn.)

20          THE CLERK:  You can have a seat there, sir.  And if

21  you could state your name and spell it.

22          THE WITNESS:  Vincent McGinnis.

23          VINCENT MCGINNIS, GOVERNMENT'S WITNESS, SWORN

24                      DIRECT EXAMINATION

25  BY MR. MORRIS:

1  Q   Mr. McGinnis, they're recording this, we don't have a

2  stenographer, so you need to speak into the microphone so we

3  get a clear recording, okay?

4  A   Oh, okay.  Okay.

5  Q   Some people speak real --

6  A   I'm a little dry right now, but --

7  Q   I think we have some water there, if it helps.  Water and

8  no cups?

9  A   No water.

10  Q   No water.  No water, no cups.  Lots of pitchers.

11  A   The pitcher.  I'll do my best.

12  Q   Okay.  That's all we can ask.

13  A   Okay.

14  Q   Mr. McGinnis, this is your son, isn't he?

15  A   Yes.

16  Q   So you've known him all his life?

17  A   Right.

18  Q   All right.  Now, you've heard these things we've heard --

19  you've heard these things we've talked about about a firearm.

20  You didn't know he had this firearm, did you?

21  A   No.  No.

22  Q   You didn't know he manufactured it or anything of that

23  sort?

24  A   No.  No, we didn't.

25  Q   And so that's not something you agree with, that a person

1  should have a sawed-off rifle, do you?

2  A    Absolutely not.  I don't own any weapons at all myself, so

3  --

4  Q    And you and your wife live together here locally; is that

5  right?

6  A    Yes.

7  Q    And she's here in the back today?

8  A    Right.

9  Q    And you both support your son very much; is that right?

10  A    Yes.  Yes.

11  Q    Now, your son has some disability issues; is that right?

12  A    Yes.

13  Q    And do you know what he's on disability for?

14  A    Yes.

15  Q    And he takes a host of medications related to that; is that

16  right?

17  A    Yes.

18  Q    And how many of those medications, would you say?

19  A    Oh, I'm not sure.  Probably three or four.  But, yeah, he's

20  probably got three or four of them.

21  Q    Okay.  And they're significant medications to help --

22  A    Yes.

23  Q    -- help his health as well?

24  A    Yes.

25  Q    Now, he also has some -- well, how would you characterize

1  his mental health?

2  A   Well, I know my wife has said that they had wanted to do an

3  MRI for him.

4  Q   Yes.

5  A   It's the doctor he goes to the VA.

6  Q   Yes.

7  A   And so they, you know, they were concerned about that.  And

8  he had been in the VA for -- at one point for some mental

9  illness issues.

10 Q   Okay.  So bipolar or something of that sort was troubling

11 him?

12 A   I think so.

13 Q   Okay.  So, but at one time he was in the service and now he

14 gets medical assistance through the Veteran's Administration;

15 is that right?

16 A   Yes.

17 Q   And they have psychologists, psychiatrists, psychotropic

18 medication, in addition to regular medical help that he

19 receives; is that right?

20 A   Yes.  They have a facility for that.

21 Q   Okay.  Now, if the Judge were to release your son, would

22 you -- would he be able to come and live with you all?

23 A   Yeah.  Yeah.  Sure.

24 Q   And sometimes what we have is it's not just a matter of

25 living with somebody.  We have something called a third-party

1    custodian.  And a third-party custodian is like an adult's

2    babysitter.  And so instead of babysitting your own kid, you'd

3    be babysitting for the Court, functionally.

4    A    Sure.

5    Q    So if you're -- there's -- there would be a set of rules

6    and you would be aware of what those rules would be and your

7    wife would be aware of those rules.  And if there was any

8    violation of the rules, that's kind of where the babysitter

9    part comes in.

10   A    Right.

11   Q    That would be if you saw if your son wasn't where he was

12   supposed to be when he was supposed to be, then you would be

13   having to be obliged to call Pretrial Services or the Marshals

14   to let them know that my son has a curfew and he's not supposed

15   to be here, or he's supposed to be here and he's not here.

16   A    Right.

17   Q    Would you be willing to do that?

18   A    Sure.  Sure.  We can do that.

19   Q    Because that's something -- when the courts count on

20   somebody to help be their eyes, they really mean it.  And so

21   it's a real solemn thing for our court system that if they

22   trust somebody to do that, they're really going to do it.

23   A    Yes.

24   Q    You know, and that would mean that he would have to go into

25   custody if you were to call law enforcement.  Would you still

1   be willing to do that?

2   A    Yes, absolutely.

3   Q    Okay.  Now, you and your wife, do you still work outside of

4   the home?  Are you retired?

5   A    I work in the home.  I work -- I do at-home work.

6   Q    Okay.

7   A    Yeah.  Work from home.

8   Q    Okay.  And is your wife retired and home most of the time

9   as well?

10  A    Yes.

11  Q    So you both would be able to keep an eye on your son for

12  most of the day; is that right?

13  A    Yes.  For most of the day, yes.

14  Q    Okay.  And you wouldn't be required to sit by his bedside,

15  but if you were to check on him and he wasn't there, you'd be

16  willing to call law enforcement; is that right?

17  A    Absolutely.

18  Q    All right.  Now, if he has -- if he were to -- if part of

19  his conditions were to go to the Veteran's Administration and

20  see a psychologist, see a psychiatrist, and if they prescribed

21  medication, would you help make sure that he took his

22  medication if that was a condition of his supervision?

23  A    Yes.

24  Q    And if he wasn't taking his medication, would you be

25  willing to call the law enforcement, Pretrial Services, or the

1  Court?

2  A   Yes.

3  Q   Okay.  Now, there are other things, such as getting a

4  person to court.  Would you be able to have in your schedule

5  room to be able to bring your son to court or to visit with

6  Pretrial Services or to take a drug test or any of the other

7  requirements that might occur?

8  A   Yes.  I can, I can do that.

9  Q   Okay.  Between -- I won't ask your wife to come up here, so

10 I'm kind of asking -- not that I have anything against you,

11 Mrs. McGinnis.

12 A   Yes.

13 Q   We don't have to hear it twice, is the point.

14 A   Right.

15 Q   So for the both -- you can speak for both of you in that

16 you'd both be willing to handle these tasks for the Court?

17 A   Yes.  Yes.

18 Q   Now, your son hasn't always lived with you, has he?

19 A   Not always.  Not always.

20 Q   He's lived out on his own on occasion and such?

21 A   Yes.  Yes.  Yes.

22 Q   And but he has -- he is able to live with you; is that

23 right?

24 A   Yes.

25 Q   Now, it's not -- is he going to have to sleep on a couch or

1  does he have his own room?

2  A    No, he has a room.

3  Q    Okay.  Now, if -- oftentimes what will be put in place is

4  an electronic monitor or a GPS, and both of those cost a small

5  sum of money.  It's not thousands.  It's around $100 a month.

6  And so would you be able to help him with the expense of that?

7  A    Yes, I can help.

8  Q    Now, sometimes the electronic monitor requires a landline.

9  A lot of folks don't have landlines.  I don't have one anymore.

10 A    Yeah, we have one.

11 Q    Fantastic.

12 A    Yeah.

13 Q    So if you have a landline, a lot of times when people do

14 have them, they'll have call waiting or call forwarding and

15 things of that sort.  If you have those things, would you be

16 willing to call the phone company and have those taken off of

17 your phone?

18 A    Yes.  Yes.

19 Q    Okay.

20 A    If required to.

21 Q    Okay.  So that wouldn't be a problem for you?

22 A    Sure.

23 Q    I never like to take that for granted because sometimes

24 people really require those devices.  Now, I don't know -- if

25 you saw your son acting in an unusual way that troubled you,

1   that even if it was not within the conditions, and those are

2   things that probably only a parent would know, --

3   A    Right.

4   Q    -- if something he was doing was troubling you, would you

5   just kind of, oh, it will go away or it will get better, or

6   will you call for Pretrial Services to help you with that?

7   A    No, we'd have to call Pretrial Services.  Yes, sir.

8   Q    Okay.  That's -- we want to make sure that people really --

9   A    Right.

10  Q    -- kind of understand the whole thing.  And again, you were

11  not aware of this firearm thing at all, were you?

12  A    Absolutely not.

13  Q    Okay.  And that's not something you'll tolerate in the

14  future, will it?

15  A    No.

16  Q    If there's anything that looks like firearms or anything of

17  that sort, you'll be willing to call law enforcement?

18  A    Absolutely.

19  Q    Now, do you have firearms in your own house?

20  A    Absolutely not.

21  Q    Okay.  And you wouldn't let anybody bring any in, would

22  you?

23  A    No.

24  Q    Okay.  All right.  Is there anything that you would like to

25  add that you think is important for the Judge to know about

1  your willingness and ability to supervise your son and him

2  following the rules?

3  A    No.  I think the questions that you asked were pertinent.

4  I think, you know, we can handle that.  We'll do that.

5  Q    Okay.  Now, the Government may have some questions for you,

6  and the Judge may have some questions for you as well.

7  A    Okay.

8                          CROSS-EXAMINATION

9  BY MR. MCKAY:

10 Q    Thank you, Mr. McGinnis.  I just have a few questions for

11 you.

12 A    Okay.

13 Q    Just to be clear, you've learned that Eric had this gun for

14 about a year; is that correct?

15 A    No.  I've learned it from being in court.  I didn't know he

16 had it before.

17 Q    Right.  And during that year, he was living with you,

18 correct?

19 A    Yeah.  He was, he was living with us.

20 Q    So he had this gun --

21 A    At some point in time he was living with us, yeah, that

22 year.

23 Q    Okay.  So he had this gun while he was living at your house

24 and you were unaware of it, correct?

25 A    No.  Right.  I didn't know about it.

1  Q    Okay.  You said he has been treated for certain mental

2  health issues.  To your knowledge, has he been taking his

3  medication faithfully?

4  A    To my knowledge, no.  I know that he takes the other

5  medication that he takes, yeah.  He takes that daily.

6  Q    Okay.  Just to be clear, when you say other medications,

7  those are not for mental health issues?

8  A    No, the -- not any psych -- I don't -- the psych -- I'm not

9  aware of the psychotropic, you know, medication.  But other

10 medications that he takes, I know that he takes that.

11 Q    Okay.  Thank you.

12 A    Yeah.

13 Q    When did you first learn that Eric was affiliated -- was

14 identifying himself as affiliated with the CIA?

15 A    Let's see.  I think when we talked to the officer from the

16 Grand Prairie.  He came to our house and he told us.  He told

17 us that Eric had mentioned that to the officers when he was

18 being arrested.

19 Q    And so that would have been around July 28th or shortly

20 after?

21 A    Yeah, right, around August, in early August, I think, when

22 the guy came.

23 Q    Okay.  So, prior to that, if he was identifying himself as

24 CIA online, you're unaware of that?

25 A    No, I had no knowledge of that.

1   Q   Okay.  At the time of his arrest in July, late July of this

2   year, did Eric have a pending court case at that time?

3   A   Court case?  He had -- he had some issues with -- for child

4   support.

5   Q   Okay.

6   A   Yeah.

7   Q   And was he having to report to court for that?

8   A   Let's see.  I think we had to go like in -- I think we had

9   to go like in August or something like that, yeah.

10  Q   Okay.  Thank you.

11          MR. MCKAY:  No further questions.

12          MR. MORRIS:  Just real briefly, Your Honor.

13                      REDIRECT EXAMINATION

14  BY MR. MORRIS:

15  Q   Mr. McGinnis, when your son was living with you before and

16  he's had this gun hiding as has been alleged, at that time he

17  had a lot more privacy than he would have now; is that right?

18  A   Oh, yeah, he had more privacy then, yeah.  But now, now

19  that if we had to, you know, be a representative of the Court,

20  you know, he won't have that level of privacy.

21  Q   You'd be a lot more in his business, wouldn't you?

22  A   Exactly.

23  Q   He wouldn't be able to lock the door and you wouldn't be

24  able to get in?

25  A   Right.

1   Q   You'd be able to come and go in the bedroom as well; is

2   that right?

3   A   Exactly.

4   Q   So you'd be keeping an eye out for anything like that?

5   A   Yes.

6   Q   Now, if the requirement was that he wasn't supposed to have

7   access to a computer, would that be a problem for you, to be

8   able to -- him not to have access to a computer?

9   A   Yeah.  We'll just take the computer that he has, you know.

10  Q   Okay.  Thank you very much.

11  A   All right.

12          MR. MCKAY:  Nothing further.

13          THE COURT:  Mr. McGinnis?

14          THE WITNESS:  Yes, ma'am.

15                     EXAMINATION BY THE COURT

16          THE COURT:  Has your son, Eric, ever threatened you or

17  your wife?

18          THE WITNESS:  Oh, no.  No.

19          THE COURT:  Has he ever been violent toward you or

20  your wife?

21          THE WITNESS:  No, not that -- no.

22          THE COURT:  You seem hesitant.

23          THE WITNESS:  No, ma'am.  No, I'm just -- because of

24  my throat, throat is dry.

25          THE COURT:  Okay.

1            THE WITNESS:  But, yeah, I was just trying to recall

2   and thinking about it all the way in the back.  But no, he

3   hasn't.

4            THE COURT:  Okay.  Anybody have any questions based on

5   my questions?

6            MR. MORRIS:  No, thank you.

7            MR. MCKAY:  No, Your Honor.  Thank you.

8            THE COURT:  One more question.  What is it about his

9   behavior that let you know that he needed some mental help?

10           THE WITNESS:  It was when he was living with that lady

11  that he had that issue with.

12           THE COURT:  Uh-huh.

13           THE WITNESS:  That was when they took him to the --

14  I'm sorry.  When he had that issue with that lady, when he got

15  that --

16           THE COURT:  The restraining order?

17           THE WITNESS:  The restraining order that, yeah.

18           THE COURT:  So you didn't have any inkling before that

19  that he might have some mental health issues?

20           THE WITNESS:  Well, when he was a kid he had some

21  issues back long back.

22           THE COURT:  But not as an adult?

23           THE WITNESS:  Not as an adult.

24           THE COURT:  Even while he was living with you?

25           THE WITNESS:  No.  No.

1           THE COURT:  I'm sorry.

2           MR. MCKAY:  Nothing further.

3           MR. MORRIS:  No, Your Honor.  Thank you.

4           THE COURT:  Sir, you may step down.  Thank you.

5           THE WITNESS:  Okay.

6      (The witness steps down.)

7           THE COURT:  Mr. Morris?

8           MR. MORRIS:  No other witnesses, Your Honor.  I had

9  asked Mr. McGinnis to speak for Mrs. McGinnis as well.  She's

10 here in support.

11          THE COURT:  Okay.  Does the Government have any

12 rebuttal?

13          MR. MCKAY:  No, Your Honor.

14          THE COURT:  Would you like to be heard in argument?

15          MR. MCKAY:  Just briefly, Your Honor.

16          THE COURT:  Okay.

17          MR. MCKAY:  From the podium?

18          THE COURT:  Yes.

19          MR. MCKAY:  Your Honor, this is a case in which Mr.

20 McGinnis didn't just possess a firearm.  He possessed an

21 assault rifle, that is in itself illegal in that it didn't --

22 it has a short barrel.  But he didn't just buy it, you know, on

23 the black market or anything like that.  He was told he cannot

24 own it, and the facts as we know them show that he tried to buy

25 a lower to build an AR.  He was turned away.  The law worked

1  and he was notified, you can't have this.  It is illegal to

2  have this.  And yet not only did he go find a way to do it, he

3  built, by his admission on the jail call, he made the part that

4  he needed to create this.  So he had worked hard to illegally

5  obtain this rifle, a very deadly weapon, of course.

6      He had -- he has associated himself with the CIA.  We know

7  that is not true.  I think that adds a level of danger to the

8  public when someone who represents himself as associated with

9  the Central Intelligence Agency, and does so especially when

10 officers have him at gunpoint and are trying to get him to

11 comply, he disregards them and asserts this association with

12 the CIA as seemingly an excuse not to comply with officers'

13 safety instructions to him at that time.

14     And, of course, Your Honor, adding to our concern for the

15 safety of the public is at the time that he was within the city

16 limits of Grand Prairie firing this illegal weapon which he had

17 illegally made, illegally obtained, he is also carrying around

18 a list which purports to have a list of American terrorists

19 which we know are current and former public officials,

20 including their contact information.  And we think, in the

21 facts of this case, we do believe that we've met our burden to

22 show that he is a public safety risk to the community.

23          THE COURT:  Mr. Morris?

24          MR. MORRIS:  Thank you very much, Your Honor.  Your

25 Honor, we have a fellow who's alleged to have an AR-15 with a

```
 1    short rifle or a short barrel and he has a domestic violence
 2    restraining order that was almost aged out.  So he had 24 of
 3    the -- 23 of the 24 months, almost finished with it.  Now, if
 4    we put a few more inches --
 5            THE COURT:  But didn't he admit that he had had it for
 6    a year before they found it, though?
 7            MR. MORRIS:  I meant mostly about out in the woods
 8    portion of it.
 9            THE COURT:  Oh, okay.
10            MR. MORRIS:  So he has this, has this thing in his
11    house, and it's got some inches missing on it.  A few more
12    inches and it's a legal firearm for anybody to possess.  I
13    guess it becomes a question of does the shortness of this
14    weapon, what does it mean in the context of weapons themselves?
15    I would contend, Your Honor, that the shortness of the weapon,
16    while it's illegal to have such a weapon, having that and going
17    out and shooting cans, shooting at woods, shooting at squirrels
18    in Grand Prairie, but you're not shooting at homes, you're not
19    shooting at targets of elected officials, you're not -- you're
20    just shooting a firearm, lots of people go out and do those
21    types of things, not necessarily in the City of Grand Prairie.
22    This state is full of people who take their firearms out and go
23    shoot in the woods.  In itself, I would say that that doesn't
24    necessarily make Mr. McGinnis a danger to the community.
25        The fact that he was almost finished with this domestic
```

1   violence and he had not -- and otherwise it doesn't sound like

2   had any kind of interaction with law enforcement with this

3   firearm that was, if these -- if the dates are correct in the

4   sense of back there in June of 2016, it was something it

5   doesn't sound like it went outside the house.  We don't know

6   the answer to that.

7        But ultimately you can put a bunch of things together and

8   make this guy into something really bad, or you can say, here's

9   a guy who maybe doesn't -- he's got some issues.  Calling

10  himself the CIA doesn't make himself a threat to the community.

11  A lot of people say that means he needs some counseling.  And

12  so I think that, to me, I think that a person who has these

13  types of issues who's 41 years old, has had minimal contact

14  with law enforcement -- I think he's got a marijuana case -- I

15  mean, he's been a long time without really having -- not having

16  the type of problems that we typically see with folks.

17       He has some serious and chronic health problems that I know

18  that he's being treated with at the Veteran's Administration.

19  I think that if we were to allow Mr. McGinnis to go into third-

20  party custodianship with his family, with an electronic

21  monitor, these folks are very sincere in their ability and

22  willingness to keep an eye on him and get him back on track to

23  being in a place where he should be, whether that's through

24  counseling at the Veteran's Administration.  We know he's at

25  the hospital there.  It's not going to be a burden on the

1  Marshals, it's not going to be a burden on Pretrial Services,

2  by having conditions that he have the medical treatment that he

3  should be and is able to get at the Veteran's Administration

4  and help a guy get back on track, as opposed to let's just put

5  him out in Kaufman County, one of the worst places that the

6  Marshals house people, where he's going to get substandard if

7  no care at all, especially for his chronic illnesses,

8  especially for his mental health as well, and just keep

9  warehousing him until he gets to a final point.

10      Are we going to help him be a better person that way,

11  somebody who has a better understanding of what's going on, or

12  can we have him under the supervision of Pretrial Services and

13  the supervision of his family and be able to help him get on

14  track and be able to be in a better spot so when he appears

15  before -- who do we have for a Judge in our case today -- Judge

16  Lynn, that he'll be able to say, you know, I've kind of -- I've

17  got it back together.

18      One of the concerns, of course, when I first saw it, of

19  this domestic violence thing, is about what's been going on

20  with that.  And it sounds like when he had the interaction with

21  the Judge back there in 2015, they said, "Yeah, you've got to

22  stay away," and he got it.  It's not like what we oftentimes

23  see in the news with people who are serial stalkers and doing

24  awful things to people.  And we see it, sadly, day in and day

25  out, and he's not that guy.

1    It sounds like he has the ability to, when he went to

2  court, to get it and say, okay, I need to stay away.  And so

3  he's not somebody that's just completely lost his marbles.

4  He's somebody, I think, that if we availed ourselves and let

5  him and had as a condition that he avail himself of the options

6  that are there at the Veteran's Administration, we could help

7  him be a better person and a more successful person than the

8  person that we're going to turn out eight or nine months from

9  now with Judge Lynn who's been locked up at the Kaufman County

10  Detention Center.

11    His folks have the willingness and ability to help him get

12  there and to start moving in a positive way.  There's -- him

13  out there shooting a rifle out in the woods in Grand Prairie

14  doesn't necessarily make him a danger to the community.  And

15  the fact that he's carrying around a backpack full of notes of

16  peoples' names and addresses with 9/11, I mean, goodness, you

17  could probably run yourself crazy all week long or all month

18  long or all year long on the Internet of finding people who

19  have the same kind of material nowadays.

20    So I'd ask, Your Honor, that you allow Mr. McGinnis to be

21  out on pretrial release.  Strict conditions are -- I think are

22  acceptable to Mr. McGinnis.  Certainly, we went through all the

23  various options with his family and they're willing to help him

24  comply and willing to call if he doesn't.  And then if he

25  doesn't, then he certainly will have nobody to blame but

1  himself and he'll be back in custody.  And that's what I have

2  on behalf of for Mr. McGinnis, Your Honor.

3          THE COURT:  Thank you.

4          MR. MORRIS:  Thank you, Your Honor.

5          THE COURT:  Mr. Morris, I am -- I understand your

6  position of wanting to make sure that Mr. McGinnis gets the

7  best opportunity to better himself during the time this case is

8  pending.  However, as everyone knows here, the issue before me

9  is whether or not there are conditions -- is a condition or

10 combination of conditions I could impose which would reasonably

11 assure Mr. McGinnis's appearances in court as required and the

12 safety of the community or any other person.  And based on the

13 evidence I've heard here today, I find that the Government has

14 met its burden of establishing that there is no condition or

15 combination of conditions I could impose which would reasonably

16 assure the safety of the community and/or another person.

17    I base that primarily on the fact that Mr. McGinnis already

18 was given an opportunity to follow the rules and he has failed,

19 specifically in the fact that he possessed a firearm, and what

20 I heard in the evidence was for approximately a year, while he

21 was under an order of restraint based on a domestic violence

22 situation, and had gone to the extraordinary length of even

23 manufacturing a firearm to possess, and also in light of the

24 fact that federal agents took the extraordinary step of even

25 going and interviewing Mr. McGinnis and explaining to him that

1   he could not possess that weapon.

2       Under some different circumstances, having a list on your

3   person that mentions 9/11 terrorists and lists public officials

4   might be something we could avoid, but under these

5   circumstances I think I would be remiss in not connecting all

6   of the circumstances, including Mr. McGinnis's extraordinary

7   attempt to become armed.

8       I am concerned, although I believe that his parents have

9   his best interest at heart and want to care for him, I am

10  really concerned that they were unaware that he had actually

11  manufactured a firearm and was armed and had ammunition while

12  he was living in their home.  And I'm also very concerned on

13  this record that they weren't more suspicious that he had some

14  serious mental health issues, because I can't help but believe

15  that, based on what I have seen here today, including the fact

16  that he identified himself to the Pretrial or told the Pretrial

17  Services officer that he uses the alias Eric the Ruler, in

18  addition to holding himself out to be a CIA -- be associated

19  with the CIA.

20      On this record, I can't help but find that the Government

21  has met its burden regarding risk of danger.  And so I am going

22  to grant the Government's motion for detention and order, Mr.

23  McGinnis, that you be detained pending your trial in this case.

24      Is there anything else to take up in this case?  Did Judge

25  Ramirez conduct the arraignment already?

1        MR. MORRIS:  I think we entered a not guilty.  Yes, as

2   a matter of fact --

3        THE COURT:  Okay.

4        MR. MCKAY:  Yes.

5        MR. MORRIS:  -- we had a long reading of the

6   indictment last --

7        THE COURT:  Then, Mr. McGinnis, sir, that does

8   conclude your hearing today.  I wish you the very best.  And

9   you are remanded to the custody of the U.S. Marshal, and the

10  attorneys are excused.

11       MR. MCKAY:  Thank you, Your Honor.

12       MR. MORRIS:  Thank you, Your Honor.

13     (Proceedings concluded at 2:51 p.m.)

14                          --oOo--

15

16

17

18

19                       CERTIFICATE

20     I certify that the foregoing is a correct transcript from
    the digital sound recording of the proceedings in the above-
21  entitled matter.

22   **/s/ Kathy Rehling**                    **12/29/2017**

23  _____    _____

24  Kathy Rehling, CETD-444                      Date
    Certified Electronic Court Transcriber

25

```
 1                              INDEX

 2   PROCEEDINGS                                                2

 3   WITNESSES

 4   Government's Witnesses       Direct Cross Redirect Recross Court

 5   Scott Satcher                   2       11

 6   Defendant's Witnesses       Direct Cross Redirect Recross  Court

 7   Vincent McGinnis               17       25      27              28

 8   EXHIBITS

 9   -none-

10   RULINGS                                                    36

11
     END OF PROCEEDINGS                                         38
12
     INDEX                                                      39
13

14

15

16

17

18

19

20

21

22

23

24

25
```